CHICAGO—FIRST DISTRICT—A. D. 1907. 95

Chicago Term. Trans. R. R. Co. v. Berkowitz.

## Chicago Terminal Transfer Railroad Company v. Herman Berkowitz.

### Gen. No. 12,966.

1. NEGLIGENCE—*when master not liable for.* Where an accident is caused by the negligent act of an employe which is entirely outside the scope of his employment, the employer is not to be held responsible.

2. PASSENGER AND CARRIER—*when prima facie case of negligence rebutted.* A carrier is not an insurer of the safety of its passengers, and it is not liable for an injury resulting to a passenger from a means not reasonably to have been anticipated or guarded against.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1906. Reversed with finding of facts. Opinion filed March 5, 1907. Rehearing allowed March 22, 1907. Opinion re-filed November 8, 1907.

**Statement by the Court.** This is an appeal from a judgment in favor of appellee in an action to recover for personal injuries.

Appellee was a passenger upon a train belonging to and operated by appellant. He was injured by reason of a collision which occurred when an uncontrolled engine, called in the testimony "Engine 18," came at a rapid rate of speed from appellant's yards and ran into that train while it was stopping at the Ashland avenue station.

The engine which caused the accident had been in use during the day, doing switching or work of that character, and at the close of the day's work the engineer in charge turned it in on what was known as the coal track in defendant's railway yard near to the roundhouse. The engine was intended to work that night and after it had been brought to a stop the engineer in charge placed the reverse lever in the center of the quadrant, opened the cylinder cocks and closed the throttle tight. He spent about fifteen minutes in-

· 96    APPELLATE COURTS OF ILLINOIS.

VOL. 137.]    Chicago Term. Trans. R. R. Co. v. Berkowitz.

specting the engine and then left it. His fireman had already left. The undisputed evidence is that this was the usual and customary way of leaving an engine when it had come in from work, that an engine left in that condition could not start without the intervention of human agency, because there is no way to admit steam from the boiler into the steam chest, and thence into the cylinders, unless the throttle is open; that even if there is a leaky throttle and the cylinder valves are closed, the engine cannot move without human agency when the reverse lever is left in the center of the quadrant, as in this case; that "the condition of all of the valves and all the apparatus on this engine" when the engineer left it "was as good as it is possible to have them, and that there were no leaks in the throttle valves." There was a pressure of eighty or 100 pounds of steam on the engine at the time.

It being intended that the engine should work that night, in charge of another engineer and fireman, a "call boy," then about nineteen years of age, whose business it was to call the fireman to work, to clean up around the roundhouse, to sweep up and also to put oil in the engines by filling the oil cans and getting them ready for work, came after the engine had been stopped and climbed onto it. He was there when the engineer left. This boy, called as a witness by plaintiff, states that in putting oil on the engines, "I would go up into the cab of the engines, try the cans and if they were not full enough I would fill them. I would go to the oil house to fill them, which is a little west of the roundhouse." He says that after the engineer left, he only remained in the engine long enough to pick up the cans and try them; that then he went to the oil-house, filled the cans, came back, got onto the engine and placed the cans on the fireman's side. This took him twelve or fifteen minutes. By this time the engine had been standing where the engineer had stopped it for about half an hour. According to the call boy's testimony, who says he did nothing to start it, the

engine now "gave a jerk, a slight move and started out." His statement is: "After it started I was going to jump. I got scared, she was going lively and I stepped back into the cab. The time it struck the other engine it appeared to be going pretty lively."

The engineer, Duffy, who was in charge of the engine of the train with which the uncontrolled engine 18 collided, testifies that when he got off his engine after the collision, the boy came toward him from engine 18, saying, "What will they do to me?" that his forehead and mouth were bleeding and he was crying. Engineer Duffy then examined engine 18 and found the throttle open and latched, and the reverse lever toward the forward corner. The call boy testifies that he "don't remember" saying to engineer Duffy, "What will they do with me," or anything of the kind.

It appears from the testimony of the engineer who was then employed as "hostler" at the roundhouse that he was instructed by the roundhouse superintendent to get engine 18 ready for work that night; that he started to do this, looked out of the door and saw 18 start; that he followed it down the track to where it had stopped after the collision and looked it over, finding the cylinder cocks open, the front sand lever open, the reverse lever in the front closed and the throttle three-quarters open and latched.

It appears that when engine 18 started from where its engineer had left it, it ran through five closed switches in order to reach the main line where the collision occurred. These switches are so constructed that, although they may be closed and locked, an engine can still be run through them if going in the right direction. They are described as "split switches," switches where one rail is split and the other is solid. It is said that an engine running so that it goes "against the points" can go through such a switch just as if it was open. If running so as to "face the

98    APPELLATE COURTS OF ILLINOIS.

VOL. 137.]    Chicago Term. Trans. R. R. Co. v. Berkowitz.

points," it is otherwise. There is evidence tending to show that such construction is customary at such places on railroads generally.

The place where the engine was left standing by the engineer was on the coal track near the roundhouse in the railroad yards of the appellant, which were fenced on the side, from which access could be readily had by the public, and were guarded on the other side by a considerable number of switch tracks, leading to the main track, about a quarter of a mile away.

JESSE B. BARTON, for appellant.

JOHN F. WATERS, for appellee; FRED W. BENTLEY, of counsel.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

It is insisted in behalf of appellant that it was not guilty of negligence in the operation of its railroad, causing the injury complained of; that a railroad company is not an insurer of the safety of its passengers, and that unless the accident might reasonably have been foreseen by a competent and experienced man accustomed to the management of locomotive engines and the construction and management of tracks of a railway, and exercising extraordinary care and prudence, appellant cannot be deemed liable; citing Davis v. C., M. & St. P. Ry. Co., 67 N. W. Rep. 16 and 1132. In this contention we are obliged to concur, in view of what the evidence, as we think, clearly shows to have been the direct and proximate cause of the accident. There can be no room for reasonable doubt, notwithstanding his denial, that the "call boy" whose duty it was to fill the oil cans on the engine, must have undertaken to experiment with the levers when he entered the engine cab with the cans of oil which he had, as he states, refilled. The evidence is too overwhelming to be questioned that the levers of the engine

when left by the engineer were so arranged as to cut off the motive power and render it impossible for the engine to start without human interference. Aside from the undisputed evidence to this effect, is the fact that the engine had remained stationary for more than half an hour before, with the "call boy" in the cab, it started on its career of destruction. Indeed appellee's attorney concedes in his brief that "the circumstances tend to show that he (the call boy) meddled with this engine."

It is contended, however, in behalf of appellee that appellant was guilty of negligence, first, "in leaving an engine charged with from 80 to 100 pounds of steam in the possession of a dull minded boy nineteen years of age." Our attention is not called to, nor do we discover, any evidence tending to show that this employe who apparently caused the accident by his meddling with what he had no right to interfere with, was not competent for the work for which he was employed. His sole duty in connection with the engine was to take the oil cans, fill and return them. There is nothing in the testimony of this young man to indicate that he was in any way dull minded. How long he had been doing the work he was employed for does not appear, but evidently long enough to have become entirely familiar with his duties and accustomed to their performance. The evidence is not disputed that it was customary to leave an engine with steam up when it was to be used by the night crew shortly after, as it was the intention this should be. Moreover, the engine was not, according to the evidence, left "in the possession of" the call boy. It appears from the testimony of the "hostler" at the roundhouse that he had received instructions to get engine 18 ready and was approaching it, when at the door of the roundhouse he saw it start off. He states it was his duty as hostler to take the engine to the coal shed after the crew got off, and unless out of order to "put her on the track to remain

100    APPELLATE COURTS OF ILLINOIS.

VOL. 137.]    Chicago Term. Trans. R. R. Co. v. Berkowitz.

there until the night crew comes and takes her.'' This he was apparently about to do when the engine was suddenly started off with the call boy in the cab. Where an accident is caused by the negligent act of an employe which is entirely outside the scope of his employment, the employer is not to be held responsible. In other words, such negligent act is not the negligence of the employer. Ill. Steel Co. v. Zolnowski, 118 Ill. App. 209-215 *et seq.*, and cases there cited; C., M. & St. P. Ry. Co. v. West, 125 Ill. 320-323; Oxford v. Peter, 28 Ill. 434-435; Whipple v. M. C. Ry. Co., 90 N. W. Rep. 287.

The other contentions in behalf of appellee are to the effect that the switches between the engine at the roundhouse and the main track upon which the engine when started forced its way and where the collision occurred were not lined up and set for the side tracks and locked. As we have said, the evidence is apparently conclusive and it is undisputed that the engine was left by its engineer at the conclusion of his day's work in a safe condition. While it appears that engines when left standing with the levers in a certain position or where the throttles are so defective as to permit steam to leak into the cylinders have been known to start, such automatic start has apparently never been known to happen and is said to be impossible when, as in this case, the levers were in proper position and there was no leak at the throttle. We discover no evidence of negligence in the fact that the switches were in condition so that an engine might run through them or over them on to the main track. It is evidently inconsistent with the practical operation of a railroad that switches should always be kept closed and locked upon side tracks leading from a roundhouse to the main track whenever an engine may be standing at the roundhouse; and we are unable to concur in the contention that the failure to do this, under the circumstances of the present case, was a failure ''to do some-

thing which human care, vigilance and forethought would have suggested."

It is urged, however, that there was negligence "in the failure of the switchman to close the switches and sidetrack the engine when he saw it making for the main line as he did, and attempting to flag it with his lantern." There is evidence to the effect that the engine passed this switchman at a rapid rate on its way to the point of collision and that the switchman "kept giving the stop signal with his lantern"; that the switch was "lined for the main and No. 18 ran through it and broke the stand so it could not be turned back for the main without putting a new stand in." It appears that with switches like those in use at that locality a train can be pushed through if going in the proper direction, as the witness states, with the switches "locked or unlocked," that "you cannot ditch a train by throwing a split switch. The reason a train cannot run off a split switch is because it goes up either one track or the other. In a split switch there is one permanent rail, so that if the switch is open it allows you to run up another track. A stub switch is where you have two ends of the track come together and you can back a train off that switch, but you cannot with a split switch. Stub switches are not common, but there are hundreds of them in this city." It would appear from this evidence that the engine could not have been derailed or ditched at the switch, no matter what the switchman might have done, if by any chance he could have anticipated the starting of this engine as it was started and its unheralded approach. Doubtless had its coming been foreseen, the switch might have been set differently or other precautionary measures might have been taken, but that the occurrence could reasonably have been foreseen at this time and place under conditions such as then existed, there is no evidence tending to show. We are compelled to the conclusion that the collision was not, under the evidence, the result

of any failure to exercise the degree of care owing by it to appellee, a passenger upon the train with which the engine collided. The switchman can scarcely be deemed negligent for failure to prevent an accident by a wild engine, which passes before he has time to perceive the danger or provide a remedy.

The engine which caused the accident was left in a safe condition on the coal track near the roundhouse in the railroad yards of appellant. In this respect the case differs materially from Elgin, Aurora & Southern T. Co. v. Wilson, 217 Ill. 47-52, where the accident occurred by reason of negligence in failing to lock or guard a switch which was exposed so that a boy not in the employ of the railroad company opened it in the absence of the switchman. In that case it was said: "That a collision was caused by the tortious act of a stranger could have no effect to relieve the common carrier from responsibility to an injured passenger, if the failure of the carrier to do that which human foresight and forethought would have suggested presented the opportunity for the commission of the tortious act." Under the facts in the case at bar it is apparent that human foresight and forethought would not be likely to suggest that this young man of nineteen years, no longer a mere boy, who had been in the employ of the company long enough to become familiar with his duties as such employe, would go out of his way to meddle with the machinery of an engine which he had nothing to do with as an employe, and set in motion, as he did, its immense power, with which he was familiar, at the risk of his own life as well as of injury to other persons and property.

For the reasons indicated, the judgment must be reversed, with a finding of facts.

*Reversed, with finding of facts*